UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTINA BARON, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:11-CV-198 (JCH) |
| | : | |
| v. | : | |
| | : | |
| MAXAM NORTH AMERICA, INC. and | : | APRIL 13, 2012 |
| MAXAM INITIATION SYSTEMS, LLC | : | |
| Defendants. | : | |

**RULING RE: PLAINTIFF'S MOTION TO REMAND (DOC. NO. 39) AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 21)**

**I.   INTRODUCTION**

Plaintiff, Christina Baron, brings this case against her former employer, Maxam Initiation Systems, LLC, and its parent company, Maxam North America, Inc. (collectively, "Maxam"), alleging that she was discriminated against on the basis of her pregnancy, in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(7).  Baron originally brought her claim in Connecticut state court, but Maxam removed the case to federal court.  Maxam then moved for summary judgment as to Baron's claim.  Subsequent to Maxam's Motion for Summary Judgment, Baron filed a Motion to Remand to State Court.

**II.   FACTUAL BACKGROUND**

In or around November 2007, Maxam hired Baron on a temporary basis to serve as an assembly line worker at its manufacturing facility in Sterling, CT.  L.R. 56(a)(1) Stmt. ¶ 1; L.R. 56(a)(2) Stmt. ¶ 1.  In or around May 2008, Maxam hired Baron as a regular full-time employee.  L.R. 56(a)(1) Stmt. ¶ 2; L.R. 56(a)(2) Stmt. ¶ 2.  Around that time, the Plant Manager, Anthony Tremblay, assigned Baron to the position of shift line

1

supervisor, or line lead, on the third shift. See L.R. 56(a)(1) Stmt. ¶ 2; L.R. 56(a)(2) Stmt. ¶ 2. In this position, Baron was responsible for assembly duties, overseeing production, reviewing orders and assigning work, ensuring work was performed in a safe, proper, and timely manner, and generally supervising team members. L.R. 56(a)(1) Stmt. ¶ 3; L.R. 56(a)(2) Stmt. ¶ 3.

In or around June or July 2008, Maxam began running a "swing shift" between the normally scheduled first and third shifts, and Tremblay assigned Baron to be line lead on the newly scheduled second shift. See L.R. 56(a)(1) Stmt. ¶ 4; L.R. 56(a)(2) Stmt. ¶ 4. Approximately a month later, Maxam eliminated the second shift, and reassigned Baron back to her position in the third shift as a line lead, which she shared with the incumbent third shift line lead going forward. L.R. 56(a)(1) Stmt. ¶ 5; L.R. 56(a)(2) Stmt. ¶ 5.

In or around May 2008, Tremblay counseled Baron regarding her use of a company computer for personal matters during working hours. L.R. 56(a)(1) Stmt. ¶ 6; L.R. 56(a)(2) Stmt. ¶ 6. On or about July 16, 2008, Tremblay issued an "Employee Warning Notice" to Baron for her failure to wear her safety glasses on consecutive days. L.R. 56(a)(1) Stmt. ¶ 8; L.R. 56(a)(2) Stmt. ¶ 8. The parties dispute whether Tremblay was aware Baron was pregnant when he issued that Notice. See L.R. 56(a)(1) Stmt. ¶ 9; L.R. 56(a)(2) Stmt. ¶ 9. Baron asserts that she notified Tremblay of her pregnancy "around the middle of July 2008." Baron Aff. ¶ 3. Maxam asserts that Tremblay became aware of Baron's pregnancy shortly after he issued the Notice on July 16, 2008. L.R. 56(a)(1) Stmt. ¶ 9.

2

On or about September 2, 2008, Maxam's General Manager, Dan Francelj, counseled Baron for submitting an inaccurate time card. L.R. 56(a)(1) Stmt. ¶ 10; Francelj Aff. ¶ 3.[1] On September 17, 2008, Tremblay issued Baron a "Disciplinary Action/Warning" for failing to sign out detonators. L.R. 56(a)(1) Stmt. ¶ 11;[2] Baron Dep. 138–45; Tremblay Dep. 20–21.

On October 3, 2008, an incident occurred where a live detonator ended up in a scrap box with inert detonators that were to be crushed, creating a safety hazard ("October 2008 incident"). See L.R. 56(a)(1) Stmt. ¶ 12; L.R. 56(a)(2) Stmt. ¶ 12. At Francelj's directive, Tremblay obtained written statements from several assembly workers who were familiar with the incident. See L.R. 56(a)(1) Stmt. ¶ 12; L.R. 56(a)(2) Stmt. ¶ 12. According to those statements, Baron was primarily responsible for the safety hazard. L.R. 56(a)(1) Stmt. ¶ 12; L.R. 56(a)(2) Stmt. ¶ 12.

As line lead, Baron had overall responsibility for ensuring all safety guidelines were followed during her shift. L.R. 56(a)(1) Stmt. ¶ 13; L.R. 56(a)(2) Stmt. ¶ 13. After reviewing the witness statements and speaking with Tremblay, Francelj determined that Baron was at fault for creating, or failing to prevent, a safety hazard as a result of the October 2008 incident. L.R. 56(a)(1) Stmt. ¶ 15;[3] Francelj Aff. ¶ 8.

---

[1] Baron denies this fact in her Local Rule 56(a)(2) Statement; however, she does not cite to any evidence to support his denial. See L.R. 56(a)(2) Stmt. ¶ 10. In accordance with L.R. 56(a)(3), where a party fails to provide a specific citation to evidence in the record, the court may deem such facts to be admitted. Because Maxam's asserted fact is supported by evidence in the record and Baron has failed to provide specific citations to support her denial of the fact, the court will deem the fact to be admitted.

[2] See supra n. 1.

[3] See supra n. 1.

In early October 2008, Francelj decided to eliminate the third shift, in response to a management directive to cut costs. L.R. 56(a)(1) Stmt. ¶ 16;[4] Tremblay Dep. 31–33; Francelj Aff. ¶ 4–5. Francelj determined that capacity could be met by adding only three of the five third shift employees to the first shift. L.R. 56(a)(1) Stmt. ¶ 17;[5] Francelj Aff. ¶ 5. Francelj selected Jessica Espita, a non-pregnant third shift employee, and Baron to be laid off. L.R. 56(a)(1) Stmt. ¶ 17;[6] Francelj Aff. ¶¶ 5–6. Maxam then discharged Baron, effective October 17, 2008. L.R. 56(a)(1) Stmt. ¶ 20; L.R. 56(a)(2) Stmt. ¶ 20.

Baron originally filed this action in Connecticut Superior Court on January 10, 2011. See Doc. No. 1. On February 7, 2011, defendants removed the case to this court, asserting that removal was proper pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. See id. On February 9, 2012, the court ordered defendants to come forward with some basis to support their assertion that the court has jurisdiction over this case. See Doc. No. 36. Defendants filed a response on February 17, 2012. See Doc. Nos. 37–38. On February 29, 2012, Baron filed a Motion to Remand to State Court. See Doc. No. 39. Defendants subsequently opposed Baron's Motion to Remand. See Doc. No. 43.

## II.    MOTION TO REMAND

Prior to addressing Maxam's Motion for Summary Judgment, the court must first determine whether it has subject matter jurisdiction over this claim. As defendants removed the case to federal court, they have the burden of establishing that diversity jurisdiction exists. See Mehlenbacher v. Akzo Nobel Salt, Inc., 216 F.3d 291, 296 (2d Cir. 2000).

---

[4] See supra n. 1.

[5] See supra n. 1.

[6] See supra n. 1.

Pursuant to 28 U.S.C. § 1332, diversity jurisdiction exists "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."[7]  The existence of federal subject matter jurisdiction over an action removed from state court is normally determined as of the time of removal.  See Hallingby v. Hallingby, 574 F.3d 51, 56 (2d Cir. 2009).  Maxam must demonstrate that "it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount."  See Mehlenbacher, 216 F.3d at 296 (internal quotations omitted).  Baron argues that the jurisdictional amount is not met because, at the time Maxam removed the case in February 2011, there was a pending action in state court to enforce an agreement between the parties to settle these claims for $10,000.[8]  See Doc. No. 39 at 2.  In addition, on March 1, 2012, Baron filed a post-removal clarifying stipulation stating:

> The plaintiff, Christina Baron, will neither seek nor accept damages against the defendants Maxam North America, Inc. and Maxam Initiation Systems, LLC for claims asserted in her state court complaint – that was removed to this Court – in excess of the amount that falls below the minimum for diversity jurisdiction under 28 U.S.C. § 1332.

Maxam argues that such a stipulation is insufficient to deprive the court of jurisdiction, and that a reasonable estimate of Baron's potential recovery is well in excess of the jurisdictional amount.  See Doc. Nos. 37, 43.

In accordance with Connecticut practice, Baron's "Demand for Relief" requests damages "in excess of $15,000."  See Doc. No. 1.  Where the pleadings are inconclusive as to the amount in controversy, courts may look outside the pleadings to

---

[7] It appears undisputed that complete diversity exists in this case.

[8] On June 20, 2011, a Superior Court judge determined that the agreement was not enforceable because defendants decided not to sign the agreement.  See Baron v. Maxam Initiation Sys., LLC, et al, WWM-CV-09-5005218-S, Entry No. 129.00.

5

other evidence in the record.  See Vermande v. Hyundai Motor Am., Inc., 352 F. Supp. 2d 195, 199 (D. Conn. 2004).  While the court may consider a settlement offer as a factor to consider in assessing the amount in controversy, the court must "be alert to the fact that settlement offers can often be wildly unrealistic and constitute mere puffery or posturing rather than a fair or realistic appraisal of a party's damages."  See id. at 202–03.  Further, "a settlement demand or even an offer of judgment is not necessarily a fixed ceiling on a plaintiff's damages."  See id. at 203.

Pursuant to the CFEPA, a plaintiff may recover back pay, emotional distress damages, and reasonable attorneys' fees.  See C.G.S. § 46a-104; Thames Talent, Ltd. v. Comm'n on Human Rights, 265 Conn. 127, 141 (2003); Patino v. Birken Mfg. Co., 2009 Conn. Super. LEXIS 1331, at *44 (May 15, 2009).  Maxam asserts that Baron's back pay may equal approximately $25,000.  See Doc. No. 37 at 4–5.  In addition, emotional distress damages awards vary widely.  See Patino, 2009 Conn. Super. LEXIS at *46 (noting that emotional distress damages of $5,000 to $65,000 may be appropriate for "less severe discrimination cases," and awards of $100,000 to $400,000 may be appropriate for severe discrimination cases).  Finally, should Baron prevail, she would be entitled to reasonable attorneys' fees, which Maxam estimates could equal $50,000 or higher.  See Patino v. Birken Mfg. Co., 2009 Conn. Super. LEXIS 2166, at *9, *16 (Aug. 6, 2009) (noting that Connecticut courts have adopted twelve factors to consider in determining reasonable attorney fees and awarding $42,800 in attorneys' fees for a hostile work environment claim).[9]  Taken together, there is a reasonable probability that

---

[9] Attorneys' fees may be used to satisfy the amount in controversy where they are recoverable as a matter of right pursuant to statute.  See Kimm v. KCC Trading, Inc., 2012 WL 171503, at *1 (2d Cir. Jan. 23, 2012).

6

Baron's claim may amount to an award greater than $75,000. Consequently, defendants have met their burden of establishing that the amount in controversy meets the jurisdictional amount, and the court has subject matter jurisdiction over this action.[10]

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Legal Standard

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine

---

[10] Though Baron attempts to strip the court of jurisdiction by filing a "Post-Removal Clarifying Stipulation" asserting that she will not accept damages in excess of the jurisdictional amount, the Stipulation is not sufficient to do so for two reasons. First, the Stipulation does not address the damages Baron was seeking at the time of removal, when the court's jurisdiction attached. Second, it is well-established that "a plaintiff cannot seek to deprive a federal court of jurisdiction by reducing her demand to $75,000 or less once the jurisdictional threshold has been satisfied." See Luo v. Mikel, 625 F.3d 772, 776 (2d Cir. 2010).

7

issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

    B.    Discussion

A pregnancy discrimination claim under the CFEPA is analyzed similarly to a federal claim under Title VII, as amended by the Pregnancy Discrimination Act. See Canales v. Schick Mfg., Inc., 2011 WL 4345006, at *1 (D. Conn. Sept. 15, 2011). Typically, such claims are subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See id. Plaintiff must first meet a "de minimis" burden by setting forth a prima facie case of pregnancy discrimination, by demonstrating that "(1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) [either] her position remained open and was ultimately filled by a non-pregnant employee . . . [or] the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." See id. at *1–2 (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998)). If the plaintiff meets this requirement, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. See Adamczyk v. New York State Dep't of Corr. Svcs., 2012 WL 1130637, at *2 (2d Cir. Apr. 5, 2012). If the employer sufficiently carries this burden of production,

8

"the pattern of presumptions and burden shifts . . . drops away, and the question in adjudicating the defendants' motion for summary judgment becomes simply whether the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that her dismissal was motivated at least in part by . . . discrimination." See Tomassi v. Insignia Fin. Grp., 478 F.3d 111, 114 (2d Cir. 2007).

Maxam does not appear to challenge Baron's ability to set forth a prima facie case. See Mem. Supp. Mot. at 9 (arguing that no evidence exists to demonstrate pretext). As the court must view the facts in the light most favorable to the plaintiff, the court will assume arguendo that Baron has set forth a prima facie case of discrimination.[11]

The burden of production then shifts to Maxam to set forth a legitimate, non-discriminatory reason for terminating Baron's employment. Here, Francelj asserts that, in response to a cost-cutting effort by the parent company's management which demanded significant reductions in operating expenses, he decided to discontinue the third shift, which Baron worked on, and eliminate two assembly line jobs. See Francelj Aff. ¶¶ 4–5. Francelj asserts that he selected Baron to be laid off because he understood her to be the least senior employee on the third shift, he had recently disciplined her for irregularities with her time card and was aware Tremblay had disciplined her for a safety violation, and because he had determined that she was

---

[11] It is undisputed that Baron was pregnant when she was terminated, and that Tremblay was aware of her pregnancy. L.R. 56(a)(1) Stmt. ¶¶ 9, 20; L.R. 56(a)(2) Stmt. ¶¶ 9, 20. Baron's affidavit asserts sufficient facts which, if believed, would allow a jury to find that the circumstances of her termination give rise to an inference of discrimination, especially in light of her minimal burden at this stage. See Baron Aff. ¶¶ 4–11.

9

primarily responsible for the October 2008 incident. See id. ¶ 7. On the basis of these assertions, Maxam has met its burden of production.

Next, the court considers whether the evidence, when taken in the light most favorable to the plaintiff, is sufficient to allow a reasonable jury to conclude that the defendants' asserted reason was merely a pretext for discrimination, and that the defendants' decision to terminate her employment was motivated, at least in part, by discrimination. See Tomassi, 478 F.3d at 114; Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995). Maxam argues that Baron cannot demonstrate that its decision was motived by anti-pregnancy bias because the individual Baron asserts was biased against her, her supervisor, Anthony Tremblay, was not involved in the decision to terminate her employment. See Reply at 2–3. In response, Baron asserts that Francelj considered Tremblay's input in determining which employees to terminate, that input was tainted by discriminatory animus, and consequently, Tremblay's bias played a causal role in her termination. See Pl.'s Sur-Reply at 3.

Baron's theory stems from the Supreme Court's decision regarding "cat's paw liability" in Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011). In Staub, the Court analyzed a claim pursuant to the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), and determined that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." See Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194 (2011). In analyzing the plaintiff's claim, the Court noted that USERRA "is very similar to Title VII," and relied on the background of general tort law. See id. at

1191.  In addition, the Second Circuit has previously acknowledged that, so long as the biased individual played a meaningful role in the termination process, a Title VII plaintiff may succeed on her claim even absent evidence of bias by the ultimate decisionmaker. See Holcomb v. Iona Coll., 521 F.3d 130, 143 (2d Cir. 2008).  Consequently, plaintiff may rely on a cat's paw liability theory in asserting her CFEPA claim.  See Herbert v. Nat'l Amusements, Inc., 2012 WL 201758, at *3 (D. Conn. Jan. 23, 2012) (allowing plaintiff to advance a cat's paw theory of liability in a CFEPA claim).

To establish Maxam's liability on a cat's paw basis, Baron must first demonstrate that Tremblay's actions were motivated by anti-pregnancy bias.  See Staub, 131 S. Ct. 1194.  Next, Baron must demonstrate that those actions were intended by Tremblay to cause an adverse employment action.  See id.  Finally, Baron must demonstrate that Tremblay's actions were the proximate cause of her termination.  See id.; see also Rajaravivarma v. Bd. of Trs. for the Connecticut State Univ. Sys., 2012 WL 1019877, at *20 (D. Conn. Mar. 26, 2012).

In support of her assertion that Tremblay acted with anti-pregnancy bias, Baron points to several disciplinary incidents which, she asserts, were motivated by Tremblay's negative attitude toward her after she disclosed her pregnancy.  First, Baron asserts that Tremblay disciplined her for failing to wear safety glasses, even though she had informed him that the glasses provided to her did not fit, and even though Tremblay himself failed to wear safety glasses when performing the same tasks.  See Baron Aff.

¶¶ 4–5.[12]  Next, Baron states that Tremblay disciplined her for failing to sign out detonators that another individual had failed to sign in, even though this was a common practice, in which Tremblay himself had engaged.  See id. ¶¶ 9–10.  Finally, Baron contends that, while disciplining her for her role in the October 2008 incident, Tremblay called her derogatory names and departed from ordinary conduct by leaving his office door open while disciplining her.  See id. ¶ 11.  If a jury were to believe Baron's testimony that Tremblay's attitude towards her changed after she notified him of her pregnancy, it would be reasonable for a jury to find that Tremblay's actions subsequent to that notification were motivated by anti-pregnancy bias.  See Quaratino, 71 F.3d at 65 (noting a supervisor's "change in attitude toward plaintiff" as a material disputed fact).

Next, Baron must demonstrate that Tremblay's actions were "intended by [Tremblay] to cause an adverse employment action."  See Staub, 131 S. Ct. 1194 (emphasis in original).  In Staub, the Supreme Court indicated that a jury could reasonably infer intent where a supervisor notified the personnel officer responsible for terminating employees of the plaintiff's non-compliance with a disciplinary directive and the personnel officer fired the plaintiff immediately thereafter, and there was evidence that the supervisor had specific intent to cause the plaintiff to be terminated.  See id.  Here, however, Baron has not introduced any evidence that Tremblay had any specific intent to cause Baron's termination.  Though it is undisputed that Tremblay issued discipline to Baron for failing to wear safety glasses and failing to sign out detonators, Baron does not cite any evidence to support the assertion that Tremblay intended that

---

[12] Defendants assert that this incident occurred prior to Baron's disclosure to Tremblay that she was pregnant.  See L.R. 56(a)(1) Stmt. ¶ 9.  At this stage, however, the court must view the evidence in the light most favorable to the plaintiff.  As neither party has produced evidence to demonstrate conclusively whether Baron told Tremblay of her pregnancy before or after July 16, 2008, the date of the discipline, the court will accept plaintiff's assertion at this stage.

discipline to cause Baron's termination, or that he took any steps to ensure the discipline he issued contributed to Baron's termination. Further, unlike in Staub, where the plaintiff was terminated immediately following the disciplinary incident, the disciplinary incidents here occurred one to three months before Baron was fired. See L.R. 56(a)(1) Stmt. ¶¶ 8, 11, 20; L.R. 56(a)(2) Stmt. ¶¶ 8, 11, 20.

Further, plaintiff has not introduced any evidence to contradict Francelj's assertion that he did not consult Tremblay in his decision to discontinue the third shift or to lay off two employees. See Francelj Supp. Aff. ¶ 2. Although Baron points out that Tremblay was responsible for most of Baron's disciplinary history--including compiling witness statements regarding the October 2008 incident, which Francelj relied on in determining which employees to lay off--this reliance is not enough for cat's paw liability unless Tremblay intended for that history and information to cause Baron's termination. Based on the undisputed evidence in the record, Francelj made the decision to discontinue the third shift and terminate two employees independently. There is no evidence that he consulted with Tremblay or that Tremblay knew Francelj was considering this action. Consequently, it would not be reasonable for a jury to find that Tremblay had the intent to cause Baron's termination by layoff due to a reduction in the work force when Tremblay was not aware of that upcoming action. See Adamczyk, 2012 WL 1130637, at *3 (holding that a reasonable juror could not conclude that a supervisor intended to cause an adverse employment action where there was no evidence the supervisor instigated the disciplinary inquiry which led to plaintiff's termination). Consequently, plaintiff fails set forth sufficient evidence to demonstrate pretext under a cat's paw liability theory, and summary judgment is appropriate.

## IV. CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment (Doc. No. 21) is **granted**. In addition, plaintiff's Motion to Remand to State Court (Doc. No. 39) is **denied**, plaintiff's Motion for Leave to file Sur-Reply (Doc. No. 34) is **granted**, and defendants' Consent Motion for Leave to file Response (Doc. No. 35) is **granted**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 13th day of April, 2012.

                                              /s/ Janet C. Hall
                                              Janet C. Hall
                                              United States District Judge